# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2024-CA-00759-SCT

*EAMON MOHIUDDIN*

*v.*

*JACKSON COUNTY, MISSISSIPPI BOARD OF
SUPERVISORS AND OCEAN SPRINGS ISLANDS
RV RESORT, LLC*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/05/2024 |
| TRIAL JUDGE: | HON. ROBERT KEITH MILLER |
| TRIAL COURT ATTORNEYS: | MICHAEL L. FONDREN |
| | JAMES H. COLMER, JR. |
| | ANNA JULIET RICHARDSON |
| | JOSHUA WESLEY DANOS |
| | AMY LASSITTER ST. PÉ |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | MICHAEL L. FONDREN |
| ATTORNEYS FOR APPELLEES: | JAMES H. COLMER, JR. |
| | TRISTAN RUSSELL ARMER |
| | JOSHUA WESLEY DANOS |
| | RANDY GRANT PIERCE |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | AFFIRMED - 11/13/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE RANDOLPH, C.J., CHAMBERLIN AND BRANNING, JJ.**

**BRANNING, JUSTICE, FOR THE COURT:**

¶1.     This is an appeal from the Jackson County Circuit Court's decision upholding a Jackson County Board of Supervisors' approval of a special exception to a zoning ordinance in favor of Ocean Springs Islands RV, LLC (OSIRV). The special exception would allow

OSIRV to construct and operate a recreational-vehicle (RV) resort on property that was not originally zoned for that purpose. Finding no error, we affirm the circuit court's judgment.

FACTS AND PROCEDURAL HISTORY

### I. The Property

¶2. The property at issue, located in Jackson County, Mississippi, consists of 368 acres that includes wooded islands, salt marsh, tidal ponds, and tributaries with open waters of Davis and Simmons Bayous (the Property). The Property was zoned as a Planned Unit Development (PUD) district in 2001 after Hurricane Georges flooded the area. Then, in 2006, the County approved a revised master plan that further defined the allowed uses for the Property as a resort community, a two-hundred-room hotel and conference center, an eighteen-hole golf course, or a commercial space. In 2009, the Federal Emergency Management Agency (FEMA) revised the flood maps, which resulted in the enlargement of the VE flood zone to occupy approximately 60 percent of the Property with increased base elevation requirements for buildings. While some of the Property was used as an eighteen-hole golf course before Hurricane Georges, it has remained substantially undeveloped since 2001.

¶3. In 2023, OSIRV acquired the Property with plans to construct and operate a "world class conservation-minded and nature-focused luxury RV resort" to consist of "476 RV sites with full hook-ups including all utilities, 16 tree houses, 2 bayou houses, 20 resort-owned

2

Airstreams" along with hiking trails and numerous on-site family activities. OSIRV applied for a special exception to the current zoning ordinance to accommodate these plans.

## II. Jackson County's Zoning Ordinance

¶4.     Jackson County's Zoning Ordinance (the Ordinance) governs the zoning status of all unincorporated land and water areas, buildings, and other structures in the county. Most of the property at issue was classified as a Planned Unit Development District (PUD), which is described by Article 5.01.22 of the Ordinance as follows:

> The purpose of the **Planned Unit Development District** is to provide a means for developing open space areas in larger developments, to take advantage of natural features of the landscape in the design, to improve the quality of urban environment and to reduce the costs of developing and providing public resources and utilities. The owners of any tract of land containing at least five (5) acres may submit a plan for the use and development of the entire tract for residential, compatible commercial and related uses as a single and unified project. The basic control development intensity shall be one (1) or more residential districts. The Planned Unit Development shall be a superimposed designation providing a broader latitude of design to achieve the above stated goals. No farm animals or fowl are allowed in a Planned Unit Development. The district does not allow campers, travel trailers, tents or recreational vehicles to be used for living purposes.

Any deviation in use from this stated description requires approval from the Board by way of rezoning or special exception.

¶5.     Applications for special exceptions must be submitted to the Jackson County Planning Commission (the Planning Commission), which is authorized by Section 9.12 (a) of the Ordinance "to hear and determine whether a special exception should be made to the provisions of th[e] Ordinance." The Ordinance further states that the Planning Commission

3

shall make a recommendation to grant a special exception to the Board *only* when certain conditions exist, to be further detailed below.

### III.    *Procedural History*

¶6.    On September 9, 2023, OSIRV submitted its application for a special exception to construct and operate an RV resort on the Property, most of which lies within a PUD.[1] On October 18, 2023, the Planning Commission heard the matter and recommended to the Board that the special exception be granted. On December 4, 2023, the Board of Supervisors held a public hearing on the application. After much public comment and discussion, the Board opted to delay the vote to provide ample time to consult with legal counsel. On December 18, 2023, after additional public comment, the Board approved the special exception. The Circuit Court of Jackson County affirmed the decision. Eamon Mohiuddin, an aggrieved Jackson County landowner, now appeals.

## STANDARD OF REVIEW

¶7.    The issues on appeal require a bifurcated standard of review. First, the interpretation of a zoning ordinance raises a question of law and requires a de novo review. ***Wheelan v. City of Gautier***, 332 So. 3d 851, 859 (Miss. 2022), *overruling* ***Hatfield v. Bd. of Supervisors of Madison Cnty.***, 235 So. 3d 18, 20-21 (Miss. 2017).

---

[1]Most of the Property lies within a PUD, with a small portion lying east of Beachview Drive being zoned R-1A (residential).

¶8. Next, the application of a zoning ordinance is subject to limited review, and a board's decision concerning the same will be upheld "unless it is clearly 'arbitrary, capricious, discriminatory, illegal, or without [a] substantial evidentiary basis.'" *Id.* at 855 (alteration in original) (quoting *Hatfield*, 235 So. 3d at 21). If this Court finds the decision to be "'fairly debatable,' [the Court] will not reverse it." *Id.* (quoting *Hatfield*, 235 So. 3d at 20-21).

## DISCUSSION

### I. *The Board's Interpretation of the Zoning Ordinance*

¶9. Mohiuddin argues that: 1) the Ordinance strictly prohibits RVs in a PUD and, therefore, prohibits the Board from granting a special exception for the construction of an RV resort in a PUD entirely; 2) a special exception to allow an RV resort would violate the residential-intensity component of the PUD; and 3) a rezoning application, as opposed to a special-exception application, was the proper procedural mechanism. We disagree on all three issues.

#### a. *Does the Ordinance allow an RV resort in a PUD by way of a special exception?*

¶10. Mohiuddin argues that the Ordinance strictly prohibits RVs in a PUD, therefore prohibiting a special exception. To support his position, Mohiuddin relies on *Keenum v. City of Moss Point*, 368 So. 3d 817, 819 (Miss. Ct. App. 2023) (internal quotation marks omitted), in which the Court of Appeals reversed the city's decision to grant a special exception for "business activi[ties] carried on for a profit" in a R-1A district. The City of

Moss Point's ordinance contained the following language related to R-1A single-family residential districts:

> 402.4 USES PROHIBITED
>
> 1. *Commercial* and industrial uses
>
> 2. Individual mobile homes
>
> 3. Mobile home parks
>
> 4. Trailer parks and related uses.

*Id.* at 819. In addition, the City of Moss Point's ordinance only allowed special exceptions for four distinct categorical uses: home occupations, country clubs, semi-public recreational areas, and churches. *Id.* Under the plain language of the city's ordinance, allowing a commercial business in a primarily residential area was strictly prohibited under its "prohibited use" category. *Id.* at 818-20. Therefore, the court reversed the city's decision to grant a special exception for "business activit[ies] carried on for a profit" in a R-1A district, reasoning that the special exception would have rendered the ordinance meaningless under its terms. *Id.* at 819 (internal quotation marks omitted). We find the present case to be easily distinguishable from *Keenum*.

¶11. In the present case, Section 2.01 of the Ordinance defines a special exception as follows:

> *A use which is not permitted* in the zoning district where the property is located under the provisions of this Ordinance but which in the specific case, would, in the judgment of the Board of Supervisors, promote the public health and safety, and the general welfare of the community and the granting of which

6

would not adversely affect adjacent properties. A permit granted as a Special Exception will not change the general zoning of the property or allow any change in integrity and appearance of the existing structure that would be contrary to the desired character of the district, during the occupancy or ownership of the person to whom it was granted, and upon their vacating the property or structure, the property and structure shall revert to the original use.

(Emphasis added.) Additionally, Section 10.6 of the Ordinance provides that "[t]he Planning Commission shall have the following powers to hear and recommend action relative to . . . Special Exceptions for each zoning district *when the use is not specified* in Uses Permitted or Uses Permitted on Review in that District." (Emphasis added.) The Planning Commission then provides its recommendation to the Board, which may then hear and issue (or deny) special exceptions based on the criteria in the Ordinance.

¶12. The plain language contained in the definition of a special exception authorizes the Board to grant special exceptions for "[*a*] *use which is not permitted*." (Emphasis added.) The Ordinance also contains no categorical prohibitions for special exceptions, nor does it contain a strict prohibition against RVs. Further, the Planning Commission and the Board are responsible for hearing and determining whether an applicant meets the requirements for a special exception under the Ordinance. This is in stark contrast to the City of Moss Point's ordinance, which only allowed special exceptions for four distinct categorical uses and which contained a strict prohibition against commercial uses in residential areas. ***Keenum***, 368 So. 3d at 820.

7

¶13. In the present case, because the plain language of the Ordinance does strictly prohibit an RV resort in a PUD, we find that a special exception for an RV resort in a PUD will not render the Ordinance meaningless. Therefore, we find Mohiuddin's reliance on **Keenum** to be misplaced. Based on the foregoing, we find that the Board correctly interpreted the Ordinance to permit an RV resort in a PUD upon approval of a special exception.

### b. *Would a special exception to allow an RV park in a PUD violate the residential-intensity requirement of the Ordinance?*

¶14. Mohiuddin argues that a special exception for an RV resort violates the residential-intensity component of a PUD district and is therefore prohibited by the Ordinance. Section 5.01.22 of the Ordinance states that "[t]he basic control development intensity [of PUD districts] shall be one (1) or more residential districts." Additionally, Article 9 of the Ordinance provides that a PUD is "to be planned and developed as a single entity containing one or more structures to accommodate residential, and/or commercial uses in accordance with applicable zoning regulations."

¶15. OSIRV's proposal includes a portion of permanent residences with a greater amount of temporary living quarters, but the overarching purpose of the proposed RV park is commercial in nature. While the Ordinance does not contain a definition of *residential district*, we look to the plain language of the Ordinance as it relates to the purpose of a PUD. More specifically, Section 901 of the Ordinance states that a

> Planned unit development of land may be permitted in order to provide a
> means for a more desirable physical development pattern *than would be*

*possible through the strict application* of zoning regulations . . . . The Planning Commission will permit certain *variety and flexibility* in land development to encourage the sub-divider to adjust design to regular topography . . . as well as attractive and usable buildings and building sites.

(Emphasis added.)

¶16.    Because we find that the plain language of the Ordinance clearly authorizes the Board to grant a special exception for an RV park in a PUD,  we also find that this language applies to any variety of uses within the PUD.  Accordingly, we find this issue to be without merit.

### c.      *Special Exception Versus Rezoning*

¶17.    Mohiuddin argues that the Board "cannot use a 'special exception' . . . to bypass procedural safeguards of a rezoning procedure . . ." and further that rezoning is required for "exceptionally large parcels of land . . . ."  Mohiuddin relies on *Harrison v. Mayor & Board of Alderman of Batesville*, 73 So. 3d 1145 (Miss. 2011), to support his position that OSIRV should have pursued rezoning instead of a special exception.  Mohiuddin specifically argues that pursing a special exception is not the proper procedure to change the use of an "entire zoning district" and that utilizing a special exception for this purpose would result in "illegal spot zoning."   He further argues that a special exception is more for "modest and temporary deviations from the permitted use" of the property.

¶18.    In *Harrison*, this Court held that "serious questions arise when a variance is granted to permit a use *otherwise prohibited* by an ordinance[,]" *id.* at 1152-53 (quoting *Drews v. City of Hattiesburg*, 904 So. 2d 138, 141 (Miss. 2005)), but that the determination "depends upon the circumstances of each case." *Id.* at 1151 (internal quotation mark omitted) (quoting

9

*McKibben v. City of Jackson*, 193 So. 2d 741, 744 (Miss. 1967)). Additionally, the *Harrison* Court noted that "the proper question is not whether the variance is 'spot zoning' but whether the Board acted within its scope and power under the applicable zoning ordinances." *Id.* at 1152.

¶19. To reiterate our earlier finding, the plain language of the Ordinance clearly distinguishes the present case from *Harrison*. In the present case, RVs are "not permitted" as opposed to being "strictly prohibited" under the plain language of the Ordinance. Further, because the Ordinance allows for special exceptions "for a use which is not permitted," we find the Board acted within its power to consider a special exception for an RV resort in a PUD. We, therefore, find this issue to be without merit.

### II.     The Board's Application of the Zoning Ordinance and the Decision to Grant the Special Exception

¶20. Mohiuddin argues that the Board's decision to grant the special exception was arbitrary and capricious, not supported by substantial evidence, and failed to meet the requirements for a special exception. We disagree.

¶21. Section 9.12(a) of the Ordinance states that a special exception may be granted when the following conditions exist:

1)     All procedures and provisions of Section 9.3 for public hearing procedures have been met; and

2)     The Planning Commission determines: (a) that a literal interpretation of the provisions of this ordinance would deprive the applicant of rights commonly enjoyed by other residents of the district in which the property is located, and that literal interpretation of this ordinance

10

would work an unnecessary hardship upon the applicant; (b) that the requested exception will be in harmony with the purpose and intent of this ordinance and will not be injurious to the neighborhood or the general welfare; and

3)      That the special circumstances are not the result of actions of the applicant; and

4)      That the existence of a nonconforming use of the neighboring land, buildings, or structures in the same district or of permitted or nonconforming uses in other districts shall not constitute a reason for the required exception.

### a.      *Proper Public Notice*

¶22.    Mohiuddin raises the issue of whether public notice related to hearings on OSIRV's application for a special exception was improper.  Specifically, Mohiuddin takes issue with the Property-Parcel-Identification Numbers (PPINs) and legal descriptions contained in the County's public notice.

¶23.    Mississippi Code Section 17-1-17 (Rev. 2024) provides, in relevant part, that:

> Zoning regulations, restrictions and boundaries may, from time to time, be amended, supplemented, changed, modified or repealed upon at least fifteen (15) days' notice of a hearing on such amendment, supplement, change, modification or repeal, said notice to be given in an official paper or a paper of general circulation in such municipality or county specifying a time and place for said hearing.

¶24.    The statute also provides for the hearing to be conducted before an advisory committee of citizens, who shall then recommend a disposition to the governing body. *Id.* Such hearings allow the governing body to consider and act upon the committee's recommendation; provided, however, "that any party aggrieved with the recommendation .

11

. . shall be entitled to a public hearing before the governing body . . . with due notice thereof after publication for the time and as provided in this section." *Id.* In addition, Section 9.16 of the Ordinance requires that the applicant provide "an accurate survey of property, legal description included, showing dimensions and distances of property" as part of the application. Neither the Ordinance nor the application requires that PPINs be provided.

¶25. On September 27, 2023, the Planning Committee issued its public notice to hear OSIRV's application at the Board's regularly scheduled meeting at 9:00 a.m. on October 18, 2023, in the Jackson County Services Complex. The notice included a metes-and-bounds legal description obtained from the survey of the Property and as required by the application. Following the hearing, the Planning Committee recommended that the Board grant OSIRV a special exception for the proposed project. On November 19, 2023, the Board issued a public notice to hear the matter on December 4, 2023. The notice included the same metes-and-bounds legal description contained in the Planning Committee's public notice. On December 18, 2023, after much public discussion, the Board approved the special exception. On appeal, Mohiuddin takes issue with the content of the public notices. More specifically, he argues that inconsistencies existed between the metes-and-bounds legal description and the PPINs and that such inconsistencies should have rendered the public notices invalid.

¶26. Procedural due process requires that citizens be given "[*r*]*easonable* advance notice and the opportunity to be heard[.]" ***Luter v. Hammon***, 529 So. 2d 625, 630 (Miss. 1988) (emphasis added). "The required notice must set forth the pertinent information

12

unambiguously so as to inform the interested persons of the proposed action." ***Ridgewood***

***Land Co. v. Simmons***, 137 So. 2d 532, 537 (Miss. 1962) (internal quotation marks omitted).

Additionally, this Court has held that a board's authority to act may be limited "[o]nly where

it may be said that the objectors are genuinely surprised to the point that they have not been

afforded a reasonable opportunity to marshal their evidence and witnesses in opposition to

[the proposed action]." ***Luter***, 529 So. 2d at 630. The record reflects that both public notices

issued by the Planning Committee and the Board included the date, time, and place for each

public hearing in compliance with Section 17-1-17. And each notice contained a complete

metes and bounds legal description of the Property, the sufficiency of which is not being

challenged. Based upon the applicable statutory requirements as well as the requirements

in the Ordinance, it is clear that both public notices provided reasonable notice of the

application and its purpose as well as an opportunity to be heard. Therefore, we find that

because all notice requirements were met, the fact that the PPIN's may have been incomplete

or inconsistent does not invalidate an otherwise proper notice.

¶27.    Further, this Court has held that an objector who receives notice and thereafter attends

the hearing "waives objection to insufficiency of notice because the notice has achieved its

purpose." ***Simmons***, 137 So. 2d at 538 (internal quotation mark omitted). The record reflects

that Mohiuddin appeared and participated at every single stage of the proceedings in this

case, including the Planning Commission hearing, the Board meetings on appeal, the circuit

court appeal, and now before this Court. Therefore, we find this issue to be without merit.

13

### b. Literal Interpretation—Deprivation of Rights Commonly Enjoyed

¶28. Section 9.12(a)(2)(a) of the Ordinance provides, in part, that OSIRV must prove that "that a literal interpretation of the provisions of this ordinance would deprive the applicant of rights commonly enjoyed by other residents of the district in which the property is located" among other requirements. Likewise, the Board, in its lengthy decision, held that a literal interpretation of the Ordinance would deprive OSIRV of rights commonly enjoyed by other residents of a PUD zoning district and that interpretation would work an unnecessary hardship on OSIRV. We find, however, that this portion of the Ordinance is inapplicable to the case sub judice. OSIRV is the only resident of this PUD, which is not uncommon in real-estate development. Because PUDs are designed with development in mind based on the subject land specifications, each PUD is inherently unique. It would be impossible and impractical to compare this PUD to other PUDs. Therefore, we conclude that this portion of the special exception provision of the Ordinance inapplicable to a PUD based on impracticality.

### c. Literal Interpretation—Unnecessary Hardship

¶29. Section 9.12(a)(2)(a) of the Ordinance requires the applicant prove that a "literal interpretation of this ordinance would work an unnecessary hardship upon the applicant." Mohiuddin argues that the Board erroneously found the existence of an unnecessary hardship, relying in part on *Harrison*, in which the Court adopted "the following definition for 'unnecessary hardship'":

14

> The record must show that (1) the land in question cannot yield a reasonable return if used only for a purpose allowed in that zone; (2) that the plight of the owner is due to unique circumstances of the land for which the variance is sought and not to the general conditions in the neighborhood which may reflect the unreasonableness of the zoning ordinance itself; and (3) that the use to be authorized by the variance will not alter the essential character of the locality.

*Harrison*, 73 So. 3d at 1155 (citation modified).

¶30.    In *Harrison*, the applicants requested a variance for mining in the R-1 single-family residential and the C-2 commercial-business districts of Batesville. *Id.* at 1148. This Court granted certiorari for the purpose of "clarify[ing] the standards that should apply when a zoning ordinance uses the language 'practical difficulties or unnecessary hardship' for granting a variance." *Id.* at 1150. The issue with the decision at the board level was that "[t]he Board merely provided a conclusion with no findings of fact." *Id.* at 1153. Ultimately, the Court reversed the Board's decision to grant the variance and remanded for the further proceedings in order for the Board to "provide specific findings of fact and conclusions of law to support any decision in this matter" consistent with the Court's opinion. *Id.* at 1156. Such is not the case here.

¶31.    Throughout the hearings in the present case, both parties provided voluminous information to the Planning Commission and the Board on the property as well as the reasons both for and against the special exception.   After the initial hearing, the Planning Commission recommended that the Board approve OSIRV's special exception primarily because "the land has remained vacant for 20 plus years, and mainly because of the flood

15

restrictions." Then, after additional hearings, the Board, in its six-page order, specifically found that changes in the "flood zone of the property created higher construction and floodplain management standards." The Board also found commercial development to be impractical, stating that "the base flood elevation requirements would negatively impact the height of the buildings in the area as the height restrictions set by the County's ordinance would make practically difficult to have multi-story buildings and meet the [base flood elevations]." The Board further found that "[t]he cost of insurance alone makes it practically difficult for development as residential." Additionally, the Board found that, under the Master Plan in place at the time, development "would be in extreme conflict with the purpose, intent, and objectives of the County's Flood Damage Prevention Ordinance [and that there would] not be a reasonable return on the property if developed as currently approved." Finally, the Board found that "the special circumstances are not the result of actions of the Applicant" and that "the use to be authorized by the Special Exception will not alter the essential character of the locality." For these reasons, the Board ultimately concluded that "without exception, there are simply too many hardships which make development of this property extremely difficult and impractical" and that the unnecessary-hardship standard was met.

¶32. Additionally, Mohiuddin argues that this hardship must not be "merely economic in nature." The Ordinance contains only one definition of *hardship* which states:

> Hardship, as related to variances of this Ordinance, means the exceptional hardship that would result from a failure to grant the requested variance. The

16

Board of Supervisors requires that the variance is exceptional, unusual[,] and peculiar to the property involved. Mere economic or financial hardship alone is not considered to meet the standard of exceptional under this Ordinance.

Looking to the plain language of the Ordinance, we find no such requirement for a special exception. Therefore, we find this issue to be without merit, as the Board's decision was supported by substantial evidence.

### d. In Harmony with the Purpose

¶33. Next, Mohiuddin challenges the Board's determination that the special exception would be in harmony with the intent of the Ordinance and would not be injurious to the neighborhood or general welfare.

¶34. Articles 4 and 5 of the Ordinance provide a detailed outline of the general regulations for each zoned area, including each area's permitted uses and any requirements to obtain a permitted use. Article 5, Table 5-3.22, specifically covers the regulations pertaining to PUD districts and the *intent* or *purpose* of such districts and states:

> The *purpose* of the Planned Unit Development district is to provide a means for developing open space area in larger developments, to take advantage of natural features of the landscape in the design, to improve the quality of urban environment and to reduce the costs of developing and providing public resources and utilities. The owners of any tract of land containing at least five (5) acres *may submit a plan for the use and development of the entire tract for residential, compatible commercial, and related uses as a single and unified project.* The basic control development intensity shall be one (1) or more residential districts. *The Planned Unit Development shall be a superimposed designation providing a broader latitude of design to achieve the above stated goals.*

17

(Emphasis added.) The Ordinance includes residential, commercial, and public and semi-public facilities in its permitted uses.

¶35. OSIRV presented evidence demonstrating the nature of the development as including outdoor recreation taking advantage of the natural feature of the landscape. Additionally, evidence was offered concerning the mitigation of flooding risks to neighboring properties and that the RV resort would not open for twelve months after approval to allow for roadway improvements by the County. Based on the evidence presented, the Board found that the proposed project "meets the spirit of the Ordinance as it provides a recreational opportunity to tourists and residents of the county," that the project is "recommended by FEMA . . . ," and that "this fits in FEMA's recommendations for land in flood zones and further meets the County's goals of public health, safety and general welfare." Ultimately, the Board concluded that "the requested exception will be in harmony with the purpose and intent of the Zoning Ordinance and will not be injurious to the neighborhood or the general welfare." Accordingly, we find the Board's decision on this issue to be supported by substantial evidence.

### e. Special Circumstances not Tied to Applicant's Actions

¶36. Mohiuddin argues that any hardship existing was self-created by OSIRV, and that the Board should have taken that fact into consideration. This Court has held that "[w]hether the hardship was self-created is also relevant to the determination of granting or denying a use variance . . . ." *Harrison*, 73 So. 3d at 1155. But "while not determinative of hardship,

18

[each] Board should consider the fact that [the applicant] entered into the leases with actual or constructive knowledge . . .” regarding any zoning limitations. *Id.* While we agree that OSIRV's knowledge of the zoning status is a relevant factor in determining actual hardship, we find that the Board properly considered this factor as noted in its order that states: "[t]he Applicant did not set the new flood plain elevations[,] . . . did not set the flood insurance rates, . . . did not cause the change in the character of the neighborhood over the last decade[,] . . . [and] did not cause the existing increase in nightly rentals in the area or the purchase of property for rental purposes rather than ownership." Based on the foregoing, the Board ultimately found that "the special circumstances are not the result of actions of the Applicant . . ." in determining that a hardship existed and granted the requested special exception. Accordingly, we find that the Board's decision was supported by substantial evidence, and we affirm the circuit court's decision.

## CONCLUSION

¶37. This Court finds that the Board correctly interpreted its zoning ordinance to allow an RV resort in a PUD with a special exception. We further find that the Board's decision to grant a special exception to OSIRV was not arbitrary and capricious but was instead supported by substantial evidence. Therefore, we affirm the decision of the circuit court.

¶38. **AFFIRMED.**

**RANDOLPH, C.J., KING AND COLEMAN, P.JJ., MAXWELL, CHAMBERLIN, ISHEE, GRIFFIS AND SULLIVAN, JJ., CONCUR.**

19